**Christina M. SANNEMAN, Plaintiff,**

v.

**CHRYSLER CORPORATION n/k/a Daimlerchrysler Corporation, Defendant.**

**No. 98–6044(S.D.Ill.).**

United States District Court, E.D. Pennsylvania, Philadelphia Division.

March 2, 2000.

---

Paul M. Weiss, Eric D. Freed, Phillip A. Bock, Chicago, IL, H. Laddie Montague, Stuart J. Guber, Philadelphia, PA, for plaintiff.

Charles A. Newman, Peter W. Herzog, III, Jeffrey S. Russell, St. Louis, MO, Mary Kihart, David J. Antczak, Philadelphia, PA, for defendant.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

Plaintiff Sanneman ("Plaintiff") brings this case against Defendant DaimlerChrysler Corporation, formerly known as Chrysler Corporation ("Defendant"). Specifically, Plaintiff alleges consumer fraud and deceptive business practice (Count I), fraud (Count II), breach of implied warranty of merchant-ability (Count III) and negligence (Count IV), all arising from the purchase of a vehicle manufactured and sold by Defendant with an allegedly defective paint job.[1] Currently before the court is Plaintiff's motion for class certification, by which she seeks to establish herself as a representative of the proposed class. The Defendant has moved to oppose Plaintiff's motion, and also to preclude certification of any class. The court has before it Plaintiff's Motion for Class Certification, Defendant's Motion in Opposition to Plaintiff's Motion for Class Certification and in Support of DaimlerChrysler's Motion to Preclude Certification of Any Class, Plaintiff's Opposition to Chrysler's Motion to Preclude Certification of Any Class and Defendant's Reply thereto, and Plaintiff's Opposition to Chrysler's Motion for Leave to File A Reply in Support of its Motion.

## I. BACKGROUND

The proposed class action seeks damages against DaimlerChrysler, based upon the claim that Chrysler fraudulently concealed a paint defect in many of the vehicles it manufactured beginning on or about 1990. The material facts alleged by the Plaintiff are briefly as follows.

By 1985, many automobile manufacturers, including Defendant, were "painting many of [their] vehicle lines with the Ecoat paint system," which involved two paint layers: an epoxy electrocoat primer (Ecoat) and an overlying topcoat. See Pl.'s Mem. at p. 7. According to Plaintiff, this new industry-wide system failed to prevent topcoat delamination, which became endemic among vehicles painted with the Ecoat system. Id. at 8. Topcoat delamination occurs when the Ecoat, or epoxy primer, chalks and delaminates, causing the paint to fall off vehicles. Id. According to Plaintiff, the "root cause" of the chalking and delamination is exposure ultra-violet rays, which react with the primer.[2]

1. Counts III and IV were dismissed by Judge Murphy of the Southern District of Illinois before the litigation was transferred by him to this court. Judge Murphy based the dismissal on an application of Illinois law, the relevant substantive law for this action. Because Illinois law disallows Plaintiff's allegations of breach of implied warranty of merchantability (Count III) and negligence (Count IV), we will not consider them here. Therefore, the only counts currently at issue are Counts I and II.

2. Defendant denies that UV rays are the sole cause of basecoat delamination, citing its expert witnesses' conclusions that:

... basecoat delamination can occur for a variety of reasons, including (1) environmental damage (e.g. air pollution, acid rain, industrial fallout, insecticide spraying, smoke, bird excrement, tree sap, hail, exposure to sun); (2) physical destruction (e.g. driving on gravel roads, abrasion, vandalism, collision, owner maintenance and use); (3) various manufacturing glitches (e.g. bad paint patches, assembly line stops, surface contamination, improper paint application, improper baking, and film thickness); and (4) the existence and extent of other paint "problems", including surface abrasions, stone chipping, erosion, and others. Def.'s Mem. at p. 7.

Before the use of the Ecoat system, Chrysler vehicles included an intermediate coat, between the primer and the topcoat, which was "opaque primer surfacer that shielded the epoxy coat from UV." Id. at 7. Once Chrysler began using the Ecoat system, eliminating the opaque primer surfacer, vehicle paint jobs were failing prematurely, "within just a few years of manufacture," solely because of delamination. Id. at 15.[3]

Although Plaintiff asserts that ultraviolet rays are the root cause of the Ecoat delamination, she accepts that certain variables accelerate "a vehicle's susceptibility to topcoat delamination." Id. at 15. These variables, identified by PPG, one of a handful of Ecoat paint suppliers, are: (1) type and amount of UV absorbers; (2) topcoat bake; (3) color pigmentation; (4) topcoat film thickness; (5) electrocoat primer bake; and (6) electrocoat chemistry.

Plaintiff's contention is that Chrysler knew of this problem and the cause of Ecoat delamination due to ultraviolet ray exposure by 1990,[4] but concealed its knowledge and information until 1997. Id. at 14. She states that the Defendant and/or various of its Dealerships "refused to pay the cost to repair or repaint the [damaged] vehicles," and that when asked by potential class members about the cause of the delamination, "falsely stat[ed] that [it was] caused by factors not attributable to Chrysler's ... application of primer, paint or other coating." Am.Compl. at ¶ 17.

Plaintiff is a resident of Madison County, Illinois. Am.Compl. at ¶ 2. On January 14, 1995, she purchased a used 1990 Plymouth Voyager from an Illinois automobile dealer; Plaintiff remains in possession of the car.

Id. Her claim appears to be that her vehicle was among those with the latent paint defect of Ecoat delamination that Chrysler sold without disclosing the defect to purchasers and lessees. Id. at ¶ 21. In 1995, shortly after purchasing the used vehicle, Plaintiff's husband questioned a serviceman about the exterior paint during an unrelated service appointment. The paint appeared to be "chipping" from the vehicle, and Plaintiff's husband asked the serviceman to have a Chrysler representative contact him.[5] Def.'s Mot. at p. 2; see also Sanneman Dep. at p. 60. No representative ever contacted the Plaintiff or her husband, and the matter was not followed up or pursued further. Id.

In her Amended Complaint, Plaintiff sought class certification for "all those persons who purchased or leased Chrysler motor vehicles from the model years 1986–1997, inclusive, with serious paint defects that Defendants refuse to repair." In her subsequent Motion for Class Certification, however, she has narrowed the proposed class and limited potential class members to "citizens and entities of Illinois." She now seeks certification of three classes and one sub-class, the only proposed classes at issue here. The Common Law Fraud class, Illinois Consumer Fraud sub-class, and Breach of Express Warranty class are each defined as follows:

> All citizens and entities of Illinois who: (a) are the original[6] and current owner of a model year 1990–1997 Chrysler vehicle that was painted with Ecoat and no primer surfacer on which the color topcoat is presently delaminating; or (b) are the original and current owner of such a vehicle and previously paid, in whole or in part, to repaint their vehicle's delaminating top-

---

Additionally, Defendant points out that studies have found some vehicles which suffer basecoat delamination "with *no* evidence of any failure of the electrocoat epoxy (including ultraviolet chalking ... )." Def.'s Mem at p. 8; *see also* Hess Aff. At ¶ 21, indicating that delamination can occur without a corruption of the epoxy coat.

3. In comparison, according to Plaintiff, before the use of the Ecoat system automotive paint jobs were expected to last approximately ten years. Pl.'s Mem. at p. 15.

4. Plaintiff claims that the automobile industry-and, by implication, Chrysler-in fact had significant forewarning of the problem of epoxy primer chalking and delamination when primer was not protected from ultraviolet rays. Pl.'s Mem. at 6–7.

5. The car was no longer covered by its limited written warranty at that time.

6. For the Breach of Express Warranty class, "original" is expanded by Plaintiff to include those who "purchased a 'used' vehicle within the original warranty period and had the warranty transferred."

coat; or (c) previously owned such a vehicle and paid to repaint their vehicle's delaminating topcoat.

The Illinois Consumer Fraud class differs slightly from the above, as follows:

> All citizens and entities of Illinois who: (a) are the current owner of a model year 1990–1997 Chrysler vehicle that was painted with Ecoat and no primer surfacer on which the color topcoat is presently delaminating; or (b) are the current owner of such a vehicle and previously paid, in whole or in part, to repaint their vehicle's delaminating topcoat; or (c) previously owned such a vehicle and paid to repaint their vehicle's delaminating topcoat.

Plaintiff asserts that she is an adequate representative for the classes, and that her claims are typical of the claims of members of the proposed classes. Am.Compl. at ¶ 16.

## II. DISCUSSION

Class actions are governed by Federal Rule of Civil Procedure 23. A plaintiff seeking class certification "must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met." *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994); *see* FED.R.CIV.P. 23. Rule 23(a) provides that:

> One or more members of a class may sue ... as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims ... of the representative parties are typical of the claims ... of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*Id.* Rule 23(b)(3), the relevant subpart in this matter, is satisfied if the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The instant case also presents the issue of sub-classes; each class and sub-class must meet the require-

ments of both Rule 23(a) and Rule 23(b). *Reilly v. Gould, Inc.,* 965 F.Supp. 588, 596 (M.D.Pa.1997) (*citing Retired Chicago Police Association v. City of Chicago,* 7 F.3d 584, 599 (7th Cir.1993)).

Plaintiffs bear the burden of proving that all of the requirements for certification have been met. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 163, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). District courts must undertake a "rigorous analysis" to ensure that the putative class and its proposed representative satisfy each of the prerequisites to class certification. *See Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). *Baby Neal,* 43 F.3d at 55; *Lachance v. Harrington,* 1996 WL 53801 (E.D.Pa. Feb. 7, 1996). Moreover, the court has broad discretion in determining whether a particular action complies with Rule 23. *See Horton v. Goose Creek Independent School District,* 690 F.2d 470, 487 (5th Cir. 1982)

For the reasons that follow, Plaintiff's motion for class certification is denied. We also decline to grant Defendant's motion to preclude certification of a class.[7]

### A. Class Definition

■ A prerequisite to a Rule 23 action is the actual existence of a "class." *See, e.g., In re A.H. Robins Co.,* 880 F.2d 709, 728 (4th Cir.1989); *Clay v. American Tobacco Co.,* 188 F.R.D. 483 (S.D.Ill.1999). The class must be sufficiently identifiable without being overly broad. *See Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir.1977); *Substitutes United for Better Schools v. Rohter,* 496 F.Supp. 1017, 1021 (N.D.Ill.1980). Assuming that the general outlines of membership can be determined at the outset of the litigation, a class will be deemed to exist. *See Alliance to End Repression* at 977; *Reilly,* 965 F.Supp. at 596. Plaintiff's class and sub-class definitions, as construed in the motion filed in this court on September 17, 1999, are not problematic with regard to this basic, liberal requirement.

---

**7.** Although our order denies Defendant's motion to preclude class certification, we note that if Plaintiff was to pursue a nationwide class, she would face a number of complications in addition to those considered here.

■ Defendant claims that "the proposed class cannot be determined readily without additional fact-finding," *see* Def.'s Mem. at 17, based in part on Plaintiff's history of varying class definitions, the first of which was "all those persons who purchased Chrysler motor vehicles which were improperly painted by Chrysler Corporation causing the paint to peel abnormally, and which Chrysler refuses to repair." Pl.'s Compl. at ¶ 4. While we might agree that the foregoing class definition would be overly vague, we believe that each one of Plaintiff's four current definitions would exclude individuals who are at best vaguely tangential to the litigation, and would only include individuals who might reasonably be considered as potential class members.[8] *See, e.g., Hagans v. Wyman,* 527 F.2d 1151 (2d Cir.1975).

However, the practical issue of actually identifying class members is indeed problematic, as it presents serious administrative burdens that are incongruous with the efficiencies expected in a class action.[9] Determining a membership in the class would essentially require a mini-hearing on the merits of each class member's case, which in itself renders a class action inappropriate for addressing the claims at issue. *See Wanstrath v. Time Warner Entertainment Co., L.P.,* 1997 WL 122815, at *3 (S.D.N.Y. March 17, 1997) (certification denied, as it would "bring thousands of possible claimants whose presence will ... require a multitude of mini-trials ... which will be tremendously time consuming and costly"); *Luedke v. Delta Airlines,* 155 B.R. 327, 332 (S.D.N.Y.1993) (certification denied because it would require "an unmanageable number of individualized, somewhat subjective determinations of the validity" of the potential claims); *Hagen v. City of Winnemucca,* 108 F.R.D. 61, 63 (D.Nev.1985) (certification improper when it would necessitate the court "to determine whether a person's ... rights had actually

been violated in order to determine whether that person was a class member"); *Dunn v. Midwest Buslines, Inc.,* 94 F.R.D. 170, 171–72 (E.D.Ark.1982) (class certification improper where it required "a finding of discrimination in order to define the class"). Because it would be impossible to definitively identify class members prior to individualized fact-finding and litigation, the proposed classes and sub-class fail to satisfy one of the basic requirements for a class action under Rule 23 of the Federal Rules of Civil Procedure. *See Crosby v. Social Security Administration,* 796 F.2d 576, 579–580 (1st Cir.1986).

## B. Rule 23(a)

### 1. Numerosity

■ Under Rule 23(a), a party seeking class certification must demonstrate that the proposed class is "so numerous that joinder of all members is impracticable." FED. R.CIV.P. RULE 23(a)(1). Plaintiff avers that this requirement, which is consistently construed liberally, is satisfied, "because members of the proposed Classes are so numerous and geographically dispersed throughout Illinois...." Pl.'s Mot. at ¶ 5. The Defendant does not appear to challenge the Plaintiff's claim that the class would include "thousands of Illinois vehicle owners."[10] Based on the record, and given the asserted size of the proposed class, we find that Plaintiff has satisfied the numerosity requirement. *See Wilson v. Pennsylvania State Police,* 1995 WL 422750, at *2 (E.D.Pa. July 17, 1995); *Rosen v. Fidelity Fixed Income Trust,* 169 F.R.D. 295, 298 (E.D.Pa.1995).

### 2. Commonality

■ The commonality requirement of Rule 23(a) requires that there exist questions of law or fact common to the members of the proposed class. Commonality exists when

---

**8.** This initial inquiry on class definition is distinct from those required by Federal Rule of Civil Procedure 23. The conclusion that Plaintiff's proposed classes and sub-class are as precise as required by the liberal attitude toward definition reflects only the law governing the basic class definition requirement.

**9.** *See* discussion *infra* at III.C.1. and III.C.2.

**10.** Defendant, in a footnote, states that lack of a clear class definition defeats the numerosity requirement. However, Plaintiff has adequately defined "the class in a way that enables the court to determine whether a particular individual is a class member," which is sufficient for 23(a)(1) purposes. *Safran v. United Steelworkers of America,* 132 F.R.D. 397, 400–01 (W.D.Pa.1989).

proposed class members challenge the same conduct of the defendants. *See, e.g., Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class. Because the requirement may be satisfied by a single common issue, it is easily met." *Baby Neal*, 43 F.3d at 56; *see also Alliance to End Repression*, 565 F.2d 975; *Yeager's Fuel v. Pennsylvania Power & Light Co.*, 162 F.R.D. 482, 486 (E.D.Pa.1995).

In the instant case, Plaintiff alleges that commonality exists based on a variety of issues common to each class member. *See* Pl.'s Mem. at p. 17. On behalf of each proposed member, Plaintiff challenges the Defendant's use of the Ecoat paint system, and the alleged failure to disclose that the vehicles purchased by each proposed class member "contained a latently defective paint job." Id. Each class and sub-class are clearly linked to the alleged misconduct.

Given the low threshold for the commonality requirement, we conclude that Plaintiff shares at least one question of law or fact with the prospective classes and sub-class, and therefore satisfies the requirement.

### 3. The "Typicality" Requirement

■ Rule 23(a)(3) requires that the claims of the representative party be typical of the claims of the proposed class. FED.R.CIV.P. RULE 23(a)(3). This requirement "effectively 'limits the class claims to those fairly encompassed by the named plaintiff's claims.'" *General Telephone Co. of Southwest*, 457 U.S. at 156, 102 S.Ct. 2364 (*quoting General Telephone Co. of Northwest v. EEOC*, 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)). Unlike the numerosity and commonality requirements, which evaluate the sufficiency of the class itself, the typicality requirement assesses the sufficiency of the named plaintiff. *See Weiss v. York Hospital*, 745 F.2d 786, 810 (3rd Cir.1984).

The Third Circuit recently outlined the criteria a plaintiff must prove to satisfy 23(a)(3). The court concluded that "the typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interest will be fairly represented." *Baby Neal*, 43 F.3d at 57. Essentially, the named plaintiff's claims must be typical, "in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Id.* at 55. This requirement "preclude[s] certification of those cases where the legal theories of the named plaintiff potentially conflict with those of the absentees." *Id.*

The typicality requirement may be met despite the existence of factual distinctions between the claims of the named plaintiffs and the claims of the proposed class. *Id.* at 58; *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985). Rather, a court's inquiry must involve "whether 'the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" *Baby Neal* at 57–58 (*citing Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988)). If "the class representatives ... present those common issues of law and fact that justify class treatment, thereby tending to assure that the absent class members will be adequately represented," then 23(a)(3) is satisfied. *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir.1992) (*quoting Eisenberg*, 766 F.2d at 786). Most courts share a fairly permissive approach to the rule. *See, e.g., Markham v. White*, 171 F.R.D. 217, 223 (N.D.Ill.1997); *Hummel v. Brennan*, 83 F.R.D. 141, 145 (E.D.Pa.1979); *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685, 691–692 (E.D.Pa.1977). "[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58 (internal quotation and citations omitted)

Because the test for typicality is not demanding, *see, e.g. In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 218 (E.D.La.1998) (*citing Shipes v. Trinity Inds.*, 987 F.2d 311, 316 (5th Cir.1993)), we find that the Plaintiff has met her burden. Plaintiff's

basic and primary allegation-that Defendant failed to disclose the Ecoat paint defect that manifested itself in ultraviolet-ray induced topcoat delamination, after the expiration of express warranties-extends to each potential member of the proposed class. The claims of Plaintiff and all members of the proposed class stems from this contention.

### 4. Adequacy of Representation

■ Another class certification prerequisite is that the plaintiff "will fairly and adequately protect the interests of the class." FED.R.CIV.P. 23(a)(4). The Third Circuit has stated that this inquiry should determine whether the putative plaintiff "has the ability and incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine* at 179 (citations omitted); *see also Hoxworth,* 980 F.2d at 923 ("the plaintiff must not have interests antagonistic to those of the class"). The Supreme Court has repeatedly held that such persons "must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight Sys. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (*quoting Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)). Rule 23(a)(4) does not require, however, that the representative be the "best" representative. *See Peil v. National Semiconductor Corp.,* 86 F.R.D. 357, 366 (E.D.Pa.1980) (*citing Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir.1975)).

In the instant case, Plaintiff's interests are not antagonistic to or conflicting with the classes or sub-class, as she seeks the same remedy that other potential class members would seek. Moreover, Plaintiff has the same interest and injury-repair of her vehicle's topcoat delaminating from UV rays-that all other class members would have.

However, Defendants argue that Sanneman isn't representative of all of the proposed classes and sub-class, as she is not an "original owner" of any vehicle at issue. Plaintiff admits as much in her reply to Defendant's original motion, *see id.* at 23, suggesting that this court allow an adequate class representative to intervene. Indeed, it appears at this point in the litigation that Plaintiff represents at most only one of the proposed classes or subclasses. She is the owner of a used vehicle, and therefore neither "previously [owned]" nor is "the original . . . owner" of the vehicle, as required for two of the proposed classes and the proposed sub-class. Therefore, Plaintiff would not be an adequate representative of any owners of new vehicles, but only qualifies to represent the Illinois Consumer Fraud class, which requires previous or current, but not original, ownership. We agree with Defendant that this Plaintiff would unlikely be a satisfactory representative of the various classes in any event. *See General Tel. Co. v. Falcon* at 156, 102 S.Ct. 2364 (1982).

There are possible alternatives to dismissal in such a situation. These include allowing a proceeding to continue solely on behalf of the named party, limiting the class to those persons who would be adequately represented by the named party, *see Andrews v. Bechtel Power,* 780 F.2d 124 (1st Cir.1985), establishing subclasses *see McMahon Books v. Willow Grove Assocs.,* 108 F.R.D. 32 (E.D.Pa.1985), or broadening the representative group, *see Barkman v. Wabash,* 674 F.Supp. 623, 633 (N.D.Ill.1987). However, while this litigation could not proceed as currently proposed by the Plaintiff, with her representing each class and the sub-class, a final determination for handling this issue is obviated by our finding that proposed class fails to satisfy the requirements of 23(b)(3).

Rule 23(a)(4) further requires that "the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation." *Hoxworth,* 980 F.2d at 923 (citations omitted); *see also Hassine* at 179. This requirement is meant to ensure appropriate representation of absent class members who will be bound by the judgment. *See Landy v. Amsterdam,* 96 F.R.D. 19 (E.D.Pa.1982). Plaintiff has submitted biographies of the firms representing her and proposing to represent the class; based on the quite extensive experience of the firms involved, as well as the competence attested

to by various judicial authorities quoted in the firms' biographies, we agree that Plaintiff's counsel is sufficiently experienced for the representation they have undertaken. Pl.'s Ex. 19; *see Allen v. Butz*, 390 F.Supp. 836 (E.D.Pa.1975); *Hoban v. USLIFE Credit Life Ins.*, 163 F.R.D. 509, 514 (N.D.Ill.1995) (despite a judge's disappointment with counsel in an unrelated case, the attorneys "[had] been found adequate by other judges … and their resumes indicate that they have successfully prosecuted numerous class actions in the past"). Given the record at this stage, including the apparent willingness and ability of Mr. Weiss to vigorously pursue the litigation, we have no reason to find Plaintiff's counsel unable to conduct the litigation herein considered.

## C. 23(b)

In addition to satisfying the 23(a) requirements, a putative class must comply with at least one of the sub-parts of Rule 23(b). *See Baby Neal v. Casey*, 43 F.3d 48, 55–56 (3d Cir.1994). Rule 23(b)(3) requires that "questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to the other available methods for the fair and efficient adjudication of the controversy." FED.R.CIV.P. 23(b)(3).

■ Satisfaction of the 23(a) commonality requirement, or any of the Rule 23(a) requirements, is not an indication that 23(b)(3) is likewise satisfied. *See, e.g., Amchem Products v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2249, 138 L.Ed.2d 689 (1997) (the predominance inquiry is "far more demanding" than the commonality requirement of Rule 23(a), as it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation"); *Yeager's Fuel, Inc.*, 162 F.R.D. at 486 ("finding that … joinder is impracticable" is not inconsistent with a finding that plaintiff "failed to demonstrate [superiority]"; this assertion "would effectively vitiate any meaningful distinction between the numerosity requirement and the superiority requirement"). After reviewing the issues entailed by the facts in this case, we conclude that common issues do not pre-

dominate over individual issues, and that certifying the proposed case would not, as required, further economies of time, effort, and expense, or be otherwise superior to other methods of adjudication.

### 1. Predominance

■ A class action may be certified under Rule 23(b)(3) only if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *Id.* Of course, the required predominance of common issues does not mean that individual issues must be nonexistent; class members need not be identically situated as to all issues, so long as their claims are not in conflict with each other. Any individual differences, however, must be of lesser overall significance than the common issues, and they must be manageable in a single class action. *See Chin v. Chrysler Corp.*, 182 F.R.D. 448, 453 (D.N.J.1998) (citations omitted).

■ Chrysler asserts that because each member must prove fact and extent of damage, individual issues will predominate over these aspects of the litigation. We agree. Although certain factual issues in this case may be proven on a common basis, possibly many more require individual examination. *See Bogosian*, 561 F.2d at 455. Furthermore, the need to establish injury and causation with respect to each class member will necessarily require a detailed factual inquiry including physical examination of each vehicle, an mind-boggling concept that is preclusively costly in both time and money. We will not certify a class that will result in an administrative process lasting for untold years, where individual threshold questions will overshadow common issues regarding Defendant's alleged conduct. Accordingly, we conclude that Plaintiff has not adequately shown that common issues predominate over individual issues.

Courts are hesitant to certify classes in litigation where individual use factors present themselves, such as cases involving allegedly defective motor vehicles and parts. The administrative burdens are frequently too unmanageable for a class action to make sense in such cases. Indeed, this was true in

the recent case involving alleged defects equal to those claimed here; the opinion in that case is not only on point but very instructive to this court. In *Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, the court held that Rule 23(b) precluded certification of a class for reasons equally applicable here. On the issue of common defect, the court found that "common issues do not predominate," stating:

> This case does not involve a single failure event or a simple, fungible product. Rather, Ford's challenged course of conduct spanned at least seven years and involved different models of vehicles, painted a variety of colors at different plants, using different paint formulae.... [P]laintiffs' expert agrees that one or more of the factors cited by Ford does affect the failure rates ... expected from the elimination of spray primer .... [and he] testified that whether the defect will manifest itself at all depends on other factors besides whether it

was painted with spray primer. Further, he did not dispute that failure rates vary based on how individual drivers used their vehicles and on the environmental factors to which the vehicles were exposed.

*Id.* at 220. The court concluded that "the putative plaintiffs' vehicles are not similarly situated on the defect issue." *Id.*[11] The Court's reasoning aptly expresses our misgivings in the case before us.[12]

In the instant case, the proposed classes comprise at least eight model years, 13 different manufacturing plants and hundreds of makes and models, with hundreds of different kinds and colors of paint supplied by two different paint companies.[13] There is no one product, let alone one act, to evaluate; indeed, during the years at issue Defendant sold hundreds of thousands of vehicles; we cannot conceive of how to manage the flood of people who will believe they might be in the class.[14]

**11.** A state court in Washington, faced with the same claims as were presented in *Ford Motor Co. Vehicle Paint Litig.*, and as are present here, declined to certify a state-wide class. *Schurk v. DaimlerChrysler Corp.*, No. 97–2–04113–9SEA (King County, Washington). The court's reasoning was based on the Ford case, and its conclusion was that causation and damages would require separate proceedings for each purported member. *See id.*

**12.** Plaintiff attempts to distinguish the facts of the present case from those in *Ford Motor Co. Vehicle Paint Litig.* by alerting us to the fact that the latter never mentions " 'basecoat delamination' or even the word 'delamination.' " We consider this thin argument disinguous at best, for whether or not the word "delamination" is used in the Ford litigation, this court is convinced by the facts as described in the Ford opinion that the issue was essentially the same. To wit, "Ford eliminated the intermediate spray primer ... Plaintiffs assert that the absence of spray primer ... is a 'defect' that causes the paint on the automobile to peel prematurely and to flake." *Id.* at 216.

In the following paragraph, we are informed that "Plaintiffs claim that [Ford knew] that ultraviolet light was penetrating the enamel color coat and the high build electrocoat causing the color coat to separate from the electrocoat." *Id.* This court finds no meaningful distinctions between that description and Plaintiff's own, regardless of the absence of the term "delamination." [P]laintiffs also stress that the Ford court discussed peeling paint, although we are at a loss to distinguish meaningfully between peeling and "shedding." *See* Pl.'s Mot. for Class Cert. At 3–5.

**13.** Defendants point out that the Ford litigation involved only three vehicle models spanning four years, significantly less than in the instant case. *See* 182 F.R.D. at 216–217. Of course, a consideration in that case as in many proposed nationwide class actions was the variations in state laws. That is not an issue for this court, as Plaintiff proposes an Illinois, not nationwide class.

**14.** Plaintiff herself avers that different members of the class were treated differently with respect to the repairs [Chrysler] agreed to perform. Compl. at ¶ 25.

Also, we concur with Defendant's concerns over determining such issues as what Plaintiff intends by "Chrysler vehicles." If Plaintiff means all the Chrysler nameplates, including those manufactured by other automobile manufacturers, then the variation of car models and manufacturing sites would be greatly increased, exacerbating the administrative problems the proposed action would present.

Plaintiff's attempt appears to be to convince this court of the following: that Ford's "high build electrocoat" system, without the intermediate primer coat, peeled when subjected to ultraviolet light, but that the peeling is clearly distinct from the delamination that develops when Chrysler's high build electrocoat system, without an intermediate primer coat, is subjected to ultraviolet light. Indeed, at least one of Chrysler's internal documents that was submitted by Plaintiff explains that *"paint delamination...* [causes] the clearcoat or basecoat to *flake*, or ... *peel..."* Pl.'s Ex. A–B (emphasis added).

Also, each vehicle must be examined to determine whether its paint coat is in fact delaminating, as well as whether the vehicle was painted using the Ecoat system.[15] Most individuals with some sort of paint problem on their vehicles will not be able to discern whether delamination has occurred (let alone the cause of the delamination); even many who suspect that their paint problem is not delamination understandably might want to be assured that they are correct. Each of potentially thousands-according to Plaintiff's own assertion-of vehicles would have to undergo a physical inspection to determine whether the owners or former owners are in the proposed class. Plaintiff offers us no way of solving the problems this will create, especially as determining whether a car is delaminating and, if so, what is the cause, requires defacing the vehicle with the cross-hatch adhesion test, and up to 60 minutes testing time per vehicle. The years time and extensive costs this will entail would alone be sufficient to sway us toward refusing class certification.

While ultraviolet rays may indeed cause delamination of Chrysler vehicles painted with Ecoat, unless it can be determined that ultraviolet rays are the sole cause of paint delamination and that they *will* cause delamination of vehicles painted with Ecoat and no intermediate primer, individual fact-finding would be necessary in this proposed class action. Plaintiff's expert has declared that the cause for Ecoat basecoat delamination is always ultraviolet rays. Roobol Decl. at ¶ 5, 7, 38. However, he acknowledges that other causes may contribute to or exacerbate the problem. While this court has already determined that Roobol's proffered testimony

meets the Daubert standards for scientific expert testimony,[16] the accepted proposed testimony is not that all Ecoat delamination is caused by UV rays, but that ultraviolet ("UV")-induced 'top coat delamination' is a defective condition in automobile paint jobs....*See* fn. 12. We specifically stated in our order that delamination could have causes other than ultraviolet rays, and that Dr. Roobol would not testify otherwise. *See id.* Therefore, this expert testimony will not obviate the need to determine, for each delaminating vehicle offered by the proposed class members, the cause of the delamination. Even if ultraviolet rays are the root cause of delamination, a determination will nonetheless be necessary, for each vehicle, as to whether any other factors contributed to the delamination.

Because the experts do not agree that ultraviolet rays are always the root cause of delamination, or that they ever are the only cause, proof of damages would most likely have to be made vehicle-by-vehicle, assessed according to how much of the damage is due to these contributing factors. Additional to this is that each vehicle that has suffered ultraviolet-induced basecoat delamination will have borne the paint defect differently, and on that basis alone the cost of repair, or the resale value of the vehicle, will be individualized. As we have already pointed out, since delamination that is caused by ultraviolet rays might have had other contributing factors to either the existence or rate of delamination, the amount of damages would have to be calculated in light of those factors. For example, other, unrelated paint problems that occur as a vehicle ages can make the

---

**15.** Not all vehicles manufactured by Chrysler between 1990 and 1997 were painted in the manner at issue here. Some of those vehicles, for instance, were painted with a layer of primer-a third layer of paint-over the electrocoat primer. Others were painted using the low-build electrocoat system, which is not the system is question in this case. *See* Hess Aff. at ¶ 15.

**16.** On January 11, 2000, after oral argument by counsel for Plaintiff and Defendant, we denied Defendant's Motion to Strike or Exclude Expert Testimony. We concluded that Dr. Roobol's proposed testimony was proper under *Daubert* and the Federal Rules of Evidence. *See Daubert v.*

*Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

In our order, we explained that "Dr. Roobol plans to testify that ... ultraviolet ("UV")-induced 'top coat delamination' is a defective condition in automobile paint jobs, which is caused by UV light degrading the underlying electrocoat epoxy primer. The UV light thereby causes the epoxy to "chalk" and delaminate, and thus lose adhesion to the overlying topcoat." We further noted that we acknowledged that "internal tests also reveal that there are other types of delamination," but that "counsel for Plaintiff assures us that Dr. Roobol is only referring to delamination caused by UV infiltration into the epoxy."

vehicle susceptible to basecoat delamination, as those problems can decrease the paint's overall thickness. *See Urban* Aff. at. ¶ 16. This type of individualized determination of damages, especially when contemplated for thousands of potential class members, weighs strongly against certification. *See Ford* at 220; *Broussard v. Meineke Disc. Muffler Shops, Inc.,* 155 F.3d 331 (4th Cir.1998).[17]

Moreover, there is the issue of whether a vehicle is delaminating at all. Plaintiff avers that an adhesion test, which will conclusively determine whether a vehicle is delaminating, takes a mere five minutes. Defendant disputes this, and also argues that an adhesion test is not sufficient to determine class membership. We agree with Defendant on that second point, and note that at the very least, each vehicle found to have the delamination defect will also have to be investigate to determine whether or not it was painted (1) with Ecoat, and (2) without an intermediate coat of paint. As we have already spelled out, the maintenance and care of each vehicle likely would be subject to scrutiny to discover whether the proposed class member or anything other than ultraviolet rays contributed to the delamination problem, notwithstanding the "root cause" of ultraviolet penetration. Defendants experts attest to as much; common sense persuades this court. *See* Hess Aff., Urban Aff.

The need to analyze each of "thousands" of vehicles presents yet another administrative problem in that the cross-hatch adhesion test, easy as it might be, costs money to perform, and entails damage to a car's paint coats. Obviously this test would be performed on a number of vehicles that turn out to be excluded from the proposed classes leaving the question of who would pay for the tests and subsequently necessary repairs. Defendants clearly are not responsible for the costs associated with tests required to demonstrate basecoat delamination, at least for those vehicles that turn out not to fall within any class definition. Plaintiff has not suggested that she or her counsel will assume responsibility for the costs.

Plaintiff's car exemplifies the specific and individual nature of the test required to determine whether a person qualifies for one of the proposed classes or sub-class, as well as the individualized analysis of actual damages caused by UV rays harming an inferior paint system. Plaintiff's car had traveled more than 120,000 miles at the time it was inspected, and it appeared to have been poorly maintained. *See* Urban Aff. at ¶ 22–24. Among other signs of wear and poor maintenance, the roof was rusted in spots, and on some parts of the car bare metal was exposed. The car was found to be chipped, dented, scratched and rusted in various areas.

We note out particular concern about the group of people who previously owned such a vehicle and paid to repaint their vehicle's delaminating topcoat. Given that these people are no longer in possession of the vehicle, proof of topcoat delamination would prove impossible in some cases. Also, potential members who claim that their vehicles suffered topcoat delamination that has since been repaired will face a difficult task of proving the cause and extent of delamination, as well as the necessity of the repairs already undertaken. This applies not only to the previous owners discussed above, but to "original and current owner[s]" who have "paid ... to repaint their vehicle's delaminating topcoat." While it is conceivable that some of these people will have records sufficient to indicate that their vehicle's topcoat was delaminating, it is likely that most will have a much greater challenge in so proving.

Moreover, Plaintiff seeks to include in each proposed class and subclass those vehicle owners who paid either in whole or in part to repaint the topcoats. Clearly these are two separate groups of people; the definition would include those who paid entirely to repaint and those who contributed a modest or even negligible sum. In any event, cars that have been repaired are not available for the same crosshatch test recommended by Plaintiff for cars "on which the color topcoat is presently delaminating." Determining the

---

**17.** Of course, the mere need to calculate actual damages "on an individual basis should not preclude class determination when the common is-

sues which determine liability predominate." *Bogosian,* 561 F.2d at 456.

members of the proposed classes with regard to those who are no longer in possession of their vehicles and those who have already repaired their allegedly delaminating topcoat seems very difficult indeed.

The Louisiana District Court also examined "Ford's knowledge and concealment," necessary elements of the Plaintiff's case on liability. *See In re Ford Motor Co. Vehicle Paint Litig.* at 220. Again with facts similar to those in the instant case, the court determined that knowledge and concealment would have varied over the proposed time period, as "Ford's state of knowledge was not uniform over the period" and "certain of its alleged 'concealing' activities occurred in 1992," and therefore could not have affected purchasers of cars from before that time. *Id.* at 220–222.

Plaintiff's own papers purport that the Defendant's knowledge and concealment were not undifferentiated from 1990 through 1997. Plaintiff points out that by 1997 Defendant almost surely knew of the delamination problems associated with ultraviolet rays and Ecoat. However, she makes no such claims for the early years of the class period, and by way of examples of similarly situated automobile manufacturers, makes Defendant's case that the knowledge of this particular type of delamination varied significantly over the class period.[18] Because knowing conceal-

ment is a required element of Plaintiff's fraud claims, Defendant's knowledge would have to be determined for each time period at issue. Clearly, Defendant's knowledge would not be class-wide.

Also, Plaintiff claims common law fraud, which in Illinois requires that a plaintiff prove reliance on a false statement. Common law fraud claims are frequently not certified, as the relevant individual issues would predominate. *See, e.g., In re Herley Secs. Litig.*, 161 F.R.D. 288 (E.D.Pa.1995) (negligent misrepresentation required showing of individual reliance); *Gavron v. Blinder Robinson Co.*, 115 F.R.D. 318 (E.D.Pa.1987) (common law fraud claims necessitated showing of individual reliance upon the misstatements). For fraudulent concealment, Plaintiff must demonstrate the Defendant had a duty to disclose a fact that it failed to reveal. *See Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584 (1997). Showings of duty, failure to disclose, and reliance obviously would have to be made for each class member, who purchased vehicles from a wide variety of sources, including previous owners, and might or might not have had the requisite relationship with Defendant for a fraud claim. *See In re General Motors Corp. Anti Lock Brake Prods. Liab. Litig.*, 966 F.Supp. 1525 (E.D.Mo.1997), *aff'd* 172 F.3d 623 (8th Cir.1999).

18. Plaintiff argues that the Defendant's knowledge in 1990 applies to all Chrysler vehicle purchasers from that time forward. However, during the time period for the proposed class, Defendant's knowledge of the issue of delamination nonetheless likely changed. Plaintiff cites various materials produced in the automobile industry that attest to different levels of or evolving knowledge by some manufacturers, including Chrysler. *E.g.,* Pl.' Exs. 14 (1993 GM bulletin), A–B (Chrysler 1994 videotape), 17 (Chrysler 1997 document).

We cannot simply look to Defendant's knowledge as it was in 1990 in evaluating the claims of potential class members whose vehicles were purchased years later. Any intervening knowledge, such as repair and maintenance techniques, a fuller or sharper-or perhaps lesser-understanding of delamination and the Ecoat system, or attempts to obviate delamination in future vehicles, would be highly relevant to any class member whose vehicle was painted whenever that knowledge accrued. Presumably, knowledge of paint delamination did not occur in tidy and identifiable time segments that could be

used to segment the class, but was a developing concern not clearly described according to particular dates.

Furthermore, we cannot agree with Plaintiff that Chrysler fully knew of the paint defect and its attendant solutions, complications, and so on, any more than the Defendant in the Ford litigation knew of those things. Plaintiff herself imputes the knowledge of one or another automobile manufacturer to Defendant; yet she would have us disregard that fact and assume Chrysler was possessed of information that Ford was not.

Moreover, this is not a ruling on the merits of the case. Plaintiff's contention that Defendant knew all it needed to by 1990 does not arise in full until the reply brief, and it arises with little documentation to support it.

We note, finally, that Plaintiff claims that "no class member knew of the defect's cause until 1997," which she rests solely on the appearance of an investigative television story about paint delamination. This is rather poor evidence to support the proposition that none of the thousands of potential class members were aware of delamination's cause before 1997.

Defendant's affirmative defenses present more issues to be decided on an individual basis. These defenses include: statute of limitations or laches; Plaintiff's fault, either by action or by failure to maintain the vehicle; failure to attempt reasonably to ascertain information allegedly concealed by Defendant; barring of claims by prior arbitration award, res judicata, settlement and release, or accord and satisfaction; lack of standing; unjust enrichment; and barring of claims of members who no longer own their vehicles. *See* Def.'s Ans. to Am. Comp. at p. 4–10. The merits of most of these defenses will have to be determined according to each individual plaintiff, as some of them hinge on facts specific to each class member.[19] *See e.g. Barnes v. American Tobacco Co.,* 161 F.3d 127, 149, *cert. denied* — U.S. ——, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999); *Broussard,* 155 F.3d at 342; *Arch v. American Tobacco Co.,* 175 F.R.D. 469, 491 (E.D.Pa.1997) (certification was not warranted, as individualized inquiries would be required into members' addictions and causation, product defect, and affirmative actions).

In complex cases where no one set of operative facts establishes liability, where no single proximate cause applies to each potential class member and to each defendant, and where individual issues outnumber common issues, the district court should question the appropriateness of a class action for resolving the controversy. As our above discussion makes clear, myriad individual issues thus far evident in this case represent an impediment to class action. The benefits of class action are essentially offset by the sheer number of individual issues that would arise in this litigation. When individual rather than common issues predominate, "the economy and efficiency intended by class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." 7A Charles Alan Wright & Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure § 1778 (1986). On this issue of predominance alone, we would deny Plaintiff's Motion for Class Certification.

### 2. Superiority

■ Rule 23(b)(3) also requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* The Rule lists several factors pertinent to this question:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

A finding of predominance is not an indication that the superiority requirement will be satisfied; however, frequently a finding that individual issues do not predominate is accompanied by a finding that a class action is not superior. *See In re Ford Motor Co. Vehicle Paint Litig.* at 224 (*citing Castano v. American Tobacco Co.,* 84 F.3d 734, 745 n. 19 (5th Cir.1996)); *see also* FED.R.CIV.P. 23(b)(3), Advisory Note. We find that even if Plaintiff could have satisfied the predominance requirement, her class certification motion would fail the superiority requirement.

The question is indeed a close one. Generally, it is desirable to litigate similar, related claims in one forum. That interest is especially significant in cases such as an MDL case, in which the recovery being sought by each plaintiff might not be sufficiently large to render individualized litigation a likely possibility. *See, e.g., Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Also, that one issue of a class action might require individualized inquiries will not necessarily doom the proposed litigation. *See, e.g., In re School Asbestos Litigation,* 789 F.2d 996, 1008–09 (3rd Cir.1986) (fact that damages may not be as-

---

**19.** The defense that purported class members who no longer own their vehicles are thereby barred would not require individual inquiry, but would simply rule out an entire subclass of proposed members.

sessed on class-wide basis should ordinarily not preclude certification of class).

However, in order to find superiority, a court must find all other methods of resolving the issues in a case to be inferior to a class action. The Plaintiff offers us no evidence that a class action is clearly superior, and we find that she would be unable to do so. Plaintiff's claim that the recovery of each class member will not be adequate to justify the expense of individual litigation raises a significant factor in determining superiority of the class action mechanism. However, because in this case a number of "mini-trials" would be imperative, the costs associated with a class action would be very high; due to the necessary individual litigation of a number of issues, the cost savings would not be marked. Plaintiff's related efficiency-based arguments become less forceful in light of considerations of the likely ensuing post-certification mess, and the extensive administrative problems that the action would present render it inappropriate. If there existed only a limited number of issues for which there could be no class-wide resolution, the court could perhaps certify these cases as class actions and then take steps to alleviate the problems raised by these issues.

However, as in the *Ford Motor Co. Vehicle Paint Litig.* case, we believe that "[e]ven if it were appropriate to fragment a core liability trial on [Chrysler's] conduct from mini-trials on causation, reliance, damages and affirmative defenses, this would seem to defeat the purported economies of class treatment." *Id.* at 224. Courts are hesitant to certify a class where "determining a *membership* in the class would essentially require a mini-hearing on the merits of each case." *Forman v. Data Transfer*, 164 F.R.D. 400, 403 (E.D.Pa.1995) (emphasis added); *see also Hagen*, 108 F.R.D. at 63; *Dunn*, 94 F.R.D.

at 171–72.[20] If certified as presently proposed, this case would quickly devolve into an unmanageable morass of divergent legal and factual issues. See FED.R.CIV.P. 23(b)(3) (noting that a court evaluating the superiority class action device should consider "the difficulties likely to be encountered in the management" of the class action). Such divergent issues are sufficiently numerous to negate any efficiencies brought on by the use of the class action device in this case. Additionally, the same problem of overlapping proof of issues would exist in this action. *See Ford Motor Co. Vehicle Paint Litig.* at 224 ("in a real trial there is often overlapping proof of issues ... so that proof in one phase will be revisited in another").

As we explained previously, merely identifying the anticipated class members would present the court and the parties with an impractical task. Plaintiff offers no realistic proposals for efficiently determining class members, and, as one example, given that Defendant has no "current records of all present or former owners of new and used Chrysler vehicles," determining what individuals meet the threshold requirement suggests that this court would have to engage itself in elaborate fact-finding regarding each purported class member.

As we discuss at length above, whether a car's paint job qualifies under the proposed class definition is not a straightforward matter. At issue are eight model years, during which time Defendant manufactured vehicles in 13 plants, adopting the Ecoat process at different times. *See* Hess Aff. at ¶ 14. Not all 1990–1997 vehicles were painted with Ecoat, and some of those that were actually included the intermediate layer Plaintiff complains was missing from the vehicles at issue. Others have an intermediate layer on some parts of the vehicle.[21] Plaintiff offers no

---

**20.** That, of course, would effectively vitiate any meaningful distinction between the numerosity requirement and the superiority requirement, for once a district court concluded that joinder is impracticable, the court would be required to also conclude that a class action is superior to alternative methods of resolving the parties' dispute. That, however, is not what Rule 23(a) mandates. See *Wilson v. Pennsylvania State Police Dep't*, 1995 WL 422750, at *2 (E.D.Pa. July 17, 1995) (noting that to satisfy the numerosity

requirement, joinder must be impracticable, not impossible; "[i]mpracticability is a subjective determination based on number, expediency, and inconvenience of trying individual suits.").

**21.** According to Defendant's expert, this group includes Plaintiff's vehicle. *See* Hess Aff. at ¶¶ 15–16, Ex. 2. Putting aside issues of how to determine whether delamination of a vehicle was occurring on a section painted with an intermediate layer, the parties' conflicting stances exem-

solution to determining which of this multitude of vehicles might actually conform to her proposed definitions; Defendant claims that the determination would have to be "on a vehicle-by-vehicle basis by reference to the vehicle identification number and to Daimler-Chrysler's data concerning vehicle manufacturing and assembly." Def.'s Mem. at p. 21; Hess Aff. at ¶ 15. Although the instant case differs from the similar *In re Ford Motor Co. Vehicle Paint Litig.*, in that this case implicates the laws of only one state, whereas the latter potentially implicated the laws of fifty states, we find that the prevalence of individual questions is not thereby mitigated sufficiently.[22] Also, at least one state court refused to certify a state-wide class on similar facts.

In another case involving allegedly defective motor vehicle components, the court found that a class action was not a superior means to procure a fair adjudication. The court was most concerned with the factual disputes over four engine systems, comprising at least 23 components and used in 17 or more vehicle models over five years. *Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 276–277 (D.D.C.1990). This scenario is similar to the one before us, which involves numerous plants, vehicle models, and variations in paint applications and configurations, as well as an eight-year time period.

Persuasive to our finding is that attorneys' fees are authorized by the Illinois Consumer Protection Act, and punitive damages are allowed for common law fraud claims. 815 I.L.C.S. 505/10a(c); *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 275 (7th Cir.1996). The ability to recover attorneys' fees or punitive damages belies the projected problems of a negative value suit, and offsets the potential costs associated with individual litigations for relatively small financial amounts. *See, e.g., Arch* at 296.

Finally, we take heed of the finding of some courts that a class action is not superi-

or when it would result in relatively small recoveries for individual class members while either exposing defendants to large administrative costs or consuming judicial resources, on top of the necessary abundance of court time for supervision. *See Parker v. George Thompson Ford, Inc.*, 83 F.R.D. 378 (N.D.Ga.1979); *John Does 1–100 v. Boyd*, 613 F.Supp. 1514 (D.Minn.1985).

We conclude that the economy to be achieved by class treatment of the issues is more than counterbalanced by the numerous issues relevant only to a particular class member. The few issues that might be tried on a class basis in this case, balanced against those that must be approached individually, establish that the time saved by the class action procedure would be relatively insignificant.

In sum, we conclude that a 23(b)(3) class action in this case would be absolutely unmanageable. A trial would require resolution of numerous factual and legal issues. If the plaintiff was to prevail, computing each individual class member's damages would be an endless task. The decision to deny certification in this case necessarily involves the exercise of some discretion, as a district court must be able to avoid creation of a large and unwieldy class, where it is not necessary to protect the plaintiff's rights. *See Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336 (10th Cir.1973). Because the Plaintiff has been unable to demonstrate the superiority of a class action, we decline to certify the proposed classes and sub-class.

### III. CONCLUSION

Plaintiff has failed to satisfy the requirements of Federal Rule of Civil Procedure 23, because she is not an adequate representative for each class and sub-class, because common issues do not predominate over the individual issues raised by this litigation, and because a class action would not be a superi-

---

plify the disputes this litigation would face with respect to each individual vehicle, and the difficulty of resolving these issues.

**22.** Defendants devote a significant portion of their initial memorandum arguing the impracticability of applying a wide variety of state fraud

laws in this case. However, Plaintiff does not attempt to establish a nationwide class; she seeks only to establish a class in Illinois. Therefore, Defendant's concerns regarding this court's need to construe varying state fraud laws are not relevant.

or mechanism for adjudicating the claims at issue. The administrative burdens that would present themselves throughout foreclose the possibility of a successful class action as proposed by the Plaintiff.

For the foregoing reasons, we deny Plaintiff's Motion for Class Certification.

1. Plaintiff's Motion for Class Certification, filed on September 17, 1999, is DENIED.

2. Defendant's Motion to Preclude Class Certification, filed on December 30, 1999, is GRANTED IN PART with respect to this case, and DENIED in all other respects without prejudice.

3. The parties have fourteen days from the date of this order in which to submit statements on any remaining substantive issue, pursuant to our Scheduling Order of April 7, 1999.